UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
JUSTIN HARRIS,

        *Plaintiff*,

          v.

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
----------------------------------X

**MEMORANDUM AND ORDER**

17-cv-3867 (KAM)

**KIYO A. MATSUMOTO, United States District Judge:**

      Plaintiff Justin Harris ("Plaintiff") appeals the final decision of the Commissioner of Social Security (the "Commissioner"), which found Plaintiff not disabled and, thus, not eligible for Supplemental Security Income benefits under Title XVI of the Social Security Act ("the Act").  Before the court are the parties' cross-motions for judgment on the pleadings.  For the reasons set forth below, the Commissioner's motion is DENIED, Plaintiff's motion is GRANTED in part and DENIED in part, and this action is remanded for further proceedings consistent with this Memorandum and Order.

**Background**

      The parties entered a joint stipulation of facts dated April 11, 2018, compiled from the administrative record.  (ECF No. 20-1, Joint Stipulation of Relevant Facts from the Certified Administrative Record ("Stip.").)  The Court incorporates the

facts contained therein by reference and details only those relevant to this Memorandum and Order.

## I.   Procedural History

On August 19, 2013, Plaintiff, then a 25-year-old former maintenance worker, filed an application for Supplemental Security Income ("SSI") benefits.[1]  (*Id.* ¶ 1.)  Plaintiff alleged disability from July 6, 2011 due to bipolar disorder, asthma, muscle spasms in his neck and lower and mid back, limited use of his right arm, cramps in his right upper thigh, and aches and pains.  (*Id.*)  Plaintiff's claim was denied.  (*Id.*)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (*Id.*)  On February 3, 2016, Plaintiff appeared for a hearing before ALJ James Kearns (the "ALJ").  (*Id.*)  Plaintiff, represented by counsel, appeared and testified, as did a vocational expert, Mr. Andrew Vaughn ("Mr. Vaughn").  (*Id.*)  On February 23, 2016, the ALJ issued a decision finding Plaintiff not disabled for purposes of SSI from August 19, 2013, the day Plaintiff's application was filed, through the date of the decision.  (*Id.*)  Plaintiff requested review by the Appeals Council.  (*Id.*)  On April 27, 2017, the Appeals Council denied Plaintiff's request, making the ALJ's

---

[1] Plaintiff also applied for disability insurance benefits, but lacked the requisite past earnings to qualify for such benefits.  (Stip., ¶ 1 n.2.) Plaintiff does not challenge his ineligibility for disability insurance benefits on appeal.  (*Id.*)

decision the final decision of the Commissioner.  (*Id.*)  This action followed. (*Id.*)

**I.  Non-Medical Evidence**

> A. <u>Plaintiff's Activities of Daily Living Form</u>

On September 10, 2013, in conjunction with Plaintiff's application for benefits, Plaintiff's "friend/landlord" completed an Adult Function Report on his behalf.  The form asserts the following facts:

Plaintiff lives alone and spends his days watching television, showering, eating, and sleeping.  (ECF No. 21, Administrative Record ("Tr."), at 217-18.)  Plaintiff's friend commented that Plaintiff wears the same clothes every day and is not groomed.  (*Id.* at 218.)  Plaintiff prepares his own meals and goes outside about twice a week, though he reportedly cannot go out alone because he gets confused and lost and gets into "confrontations."  (*Id.* at 219-20.)

Plaintiff spends time with others on the phone and in person on a daily basis, but has trouble getting along with others, indicating that he has "confrontations."  (*Id.* at 222.) Plaintiff struggles to get along with people in authority.  (*Id.* at 224.)  Plaintiff has problems paying attention ("I always get distracted") and finishing what he starts ("Attention span[] is short.  Always say I'll do it later.").  (*Id.* at 224.) Plaintiff has trouble remembering things ("I lose things

easily") and requires reminders to take care of certain personal needs, for instance, when to take medications and the appropriate doses.  (*Id.* at 219, 224.)  Plaintiff feels stressed by changes in schedule and claims to suffer from daily to weekly panic attacks.  (*Id.* at 225.)

      B. <u>Plaintiff's Hearing Testimony</u>

On February 3, 2016, Plaintiff, then 27 years old, appeared before the ALJ and testified as follows:

Plaintiff resides with his mother and sister.  (*Id.* at 64.)  When Plaintiff needs to travel, his mother drives him around.  (*Id.*)  Plaintiff does not travel without his mother; he "do[es]n't have anywhere to go" when she is at work.  (*Id.* at 65.)  On a typical day, Plaintiff watches television, takes naps, showers a lot, and eats.  (*Id.* at 68.)  Plaintiff's mother takes care of the housework, including cleaning, cooking, and laundry.  (*Id.*)  Plaintiff regularly leaves the house only to visit doctors.  (*Id.*)  Plaintiff sometimes visits the store, and sometimes attends church with his mother.  (*Id.* at 68-69.)

Plaintiff completed school through the ninth grade. (*Id.* at 65.)  Plaintiff had trouble in school, as he was "[f]ighting all the time."  (*Id.* at 75.)  After he left school, Plaintiff attempted to work.  (*Id.* at 75.)  Plaintiff held several jobs, primarily in the fast food industry.  (*Id.*)  Plaintiff's last job was "years" ago.  (*Id.* at 65.)  The ALJ

asked Plaintiff whether he thought he could work, to which Plaintiff responded, "No." (*Id.* at 66.)  Plaintiff said he "can't deal with a lot of people," as he "get[s] nervous" and "suffocate[s] and stuff." (*Id.*)  Plaintiff explained further that he had previously struggled at work. (*Id.* at 76.) Plaintiff was yelled at for not moving fast enough, or for not interacting with customers in the "right" way, noting that he sometimes argued with customers. (*Id.*)

   With respect to physical limitations, Plaintiff testified that he was shot when he was in the ninth grade. (*Id.* at 67.)  A fragment of the bullet remains in Plaintiff's right thigh and cannot be removed because it is adjacent to an artery. (*Id.* at 72-73.)  Plaintiff visits a doctor to address the pain from this wound. (*Id.* at 73.)  Plaintiff was also in an automobile accident when he was about twelve. (*Id.* at 73-74.) Plaintiff continues to suffer from injuries sustained in that accident, too, including headaches and back pain. (*Id.*)

   Plaintiff indicated that he struggles to sit up straight. (*Id.* at 69.)  Plaintiff finds walking painful and requires the assistance of a cane. (*Id.* at 70.)  Plaintiff can only walk four or five blocks before his leg starts to bother him. (*Id.*)  Plaintiff could lift and carry no more than a bag of groceries. (*Id.*)  Plaintiff also finds standing painful. (*Id.* at 70-71.)

Plaintiff also indicated that he struggled with psychiatric problems and visited a doctor regularly for said problems. (*Id.* at 67, 79.)  For his psychiatric problems, Plaintiff takes two medications each day – one is to help Plaintiff sleep, the other is to help Plaintiff remain calm. (*Id.* at 67.)  Plaintiff does not have any friends or a significant other. (*Id.* at 69.)  Plaintiff testified that, throughout his life, he has had trouble getting along with others. (*See id.*)  Plaintiff has always had frequent arguments which regularly devolve into altercations, including at least once with an ex-girlfriend. (*Id.* at 77, 79.)  Plaintiff indicated that, at one point, he appeared before a judge and was directed to anger management. (*Id.* at 78.)

C. Testimony of Andrew Vaughn

Mr. Vaughan, the vocational expert, also testified at the February 3, 2016 hearing before the ALJ:

Mr. Vaughan testified that Plaintiff's past work was as a fast food worker, Dictionary of Occupational Titles ("DOT") 311.472-010, Specific Vocational Preparation ("SVP") 2, light. (*Id.* at 90.)  The ALJ asked Mr. Vaughn whether a hypothetical individual with the past work of a fast food worker, the same past work as Plaintiff, who could do sedentary work with only simple and routine tasks, and could have only occasional contact with coworkers and the public, could perform that past work.

6

(*Id.*)  Mr. Vaughan responded in the negative, noting that fast food jobs would be precluded.  (*Id.*)

The ALJ clarified that the hypothetical individual's contact with co-workers and the public could occur by phone, and need not take place in person.  (*Id.*)  Mr. Vaughn then testified that this hypothetical individual could perform certain sedentary, unskilled jobs.  (*Id.* at 90-91.)  The individual could work as a: table worker or spotter, DOT 739.687-182, SVP 2; press operator, DOT 715.685-050, SVP 2; and addressing clerk, DOT 209.587-010, SVP 2.  (*Id.*)  The individual could perform these jobs if he were off task 10% of the time, but not if he were off task 15% of the time.  (*Id.*)

## II.  **Medical Evidence**

### A. Johanina McCormick, Ph.D.

On October 21, 2013, at the request of the Social Security Administration, Plaintiff was examined by Johanina McCormick, Ph.D. ("Dr. McCormick") for a consultative psychiatric evaluation.  (Tr. at 330-35.)  Dr. McCormick indicated that Plaintiff's "[d]emeanor and responsiveness to questions were mildly irritable," but that his "[m]anner of relating, social skills, and overall presentation were adequate."  (*Id.* at 331.)  Dr. McCormick noted that Plaintiff was well groomed, that his motor behavior was normal, and that his eye contact was appropriate.  (*Id.*)  Dr. McCormick found

7

Plaintiff's speech intelligibility to be fluent, but noted that his expressive language was limited to "short sentences of two to three words" and his receptive language was limited by "mild difficulty with . . . comprehension." (*Id.*)

Dr. McCormick found Plaintiff's thought processes to be "coherent and goal directed." (*Id.* at 332.) Dr. McCormick found that Plaintiff had full affect, no signs of delusions or paranoia, and a "neutral" mood. (*Id.*) Dr. McCormick indicated that both Plaintiff's "attention and concentration" and his "recent and remote memory skills" were "mildly impaired due to back pain, depression and anxiety." (*Id.*) Dr. McCormick found Plaintiff's intellectual functioning "below average," but found his general fund of information "appropriate to experience." (*Id.*) Plaintiff had "fair" insight and "poor" judgment. (*Id.*)

Turning to plaintiff's daily activities as of the date of the evaluation, Dr. McCormick noted that Plaintiff could dress, cook, bathe, and groom himself. (*Id.*) Plaintiff could not clean or do laundry. (*Id.*) Plaintiff stated that sometimes "friends" help with those activities. (*Id.*) Plaintiff can take public transportation. (*Id.*) Plaintiff stated to Dr. McCormick that he has "supportive friends." (*Id.*) Plaintiff spends his days going on errands and watching television. (*Id.* at 333.)

Turning to Plaintiff's limitations, Dr. McCormick found that Plaintiff can "follow and understand simple

directions and instructions, and perform simple tasks independently." (*Id.*)  Dr. McCormick, however, found that Plaintiff was "moderately impaired" in "maintaining attention and concentration," opining that Plaintiff could "maintain a regular schedule and learn new tasks *with help*." (*Id.* (emphasis added).)  Dr. McCormick found Plaintiff "moderately impaired" in "performing complex tasks independently," noting that Plaintiff requires supervision. (*Id.*)  Dr. McCormick found Plaintiff "moderately impaired" in making appropriate decisions. (*Id.*) Dr. McCormick also found Plaintiff "mildly impaired" in "relating adequately with others" and "appropriately dealing with stress." (*Id.*)

Dr. McCormick stated that Plaintiff's "[d]ifficulties are caused by symptoms of depression, anxiety, and short-term memory deficits." (*Id.*)  "The results of the evaluation appear to be consistent with psychiatric and cognitive problems, but in itself, this does not appear to be significant enough to interfere with [Plaintiff's] ability to function on a daily basis." (*Id.*)  Dr. McCormick gave a prognosis of "[f]air given treatment compliance." (*Id.*)

B. P. Kennedy-Walsh, M.D.

On November 19, 2013, P. Kennedy-Walsh, M.D. ("Dr. Kennedy-Walsh"), a State agency psychiatric consultant, reviewed Plaintiff's file and completed a psychiatric review technique

form.  (*Id.* at 100-08.)  Dr. Kennedy-Walsh assessed whether Plaintiff's "severe" impairment of "affective disorders," and "non severe" impairments of "other and unspecified arthropathies," met Listing 12.04 (Affective Disorders).  (*Id.* at 103.)  Dr. Kennedy-Walsh concluded they did not.  (*Id.*)

Addressing the Listing 12.04 criteria, Dr. Kennedy-Walsh opined that Plaintiff had "mild" restrictions in daily living; "moderate" difficulty "maintaining social functioning" and "maintaining concentration, persistence, or pace"; and "one or two" repeated episodes of deterioration.  (*Id.*)  Dr. Kennedy-Walsh also completed a "Mental Residual Functional Capacity ["RFC"] Assessment."  (*Id.* at 105.)  Dr. Kennedy-Walsh opined Plaintiff was limited as follows:

- <u>Understanding & Memory</u>: Plaintiff is "moderately limited" in his ability to remember locations and work-like procedures and ability to understand and remember detailed instructions.  (*Id.*)  Plaintiff is "not significantly limited" in his ability to understand and remember very short and simple instructions.  (*Id.*)

- <u>Sustained Concentration and Persistence</u>:  Plaintiff is "moderately limited" in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without supervision; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.* at 105-06.)  Plaintiff is "not significantly limited" in his ability to carry out very short and simple instructions.  (*Id.* at 105.)

- Social Interaction Limitations:  Plaintiff is "moderately
  limited" in his ability to interact appropriately with
  the general public; accept instructions and respond
  appropriately to criticism from supervisors; get along
  with coworkers or peers without distracting them or
  exhibiting behavioral extremes; and maintain socially
  appropriate behavior and adhere to basic standards of
  neatness and cleanliness.  (*Id.* at 106.)  Plaintiff is
  "not significantly limited" in his ability to ask simple
  questions or request assistance.  (*Id.*)

- Adaptation Limitations:  Plaintiff is "moderately
  limited" in his ability to respond appropriately to
  changes in the work setting.  (*Id.*)  Plaintiff is "not
  significantly limited" in his ability to be aware of
  normal hazards and take appropriate precautions; travel
  in unfamiliar places or use public transportation; and
  set realistic goals or make plans independently of
  others.  (*Id.*)

Dr. Kennedy-Walsh provided some additional detail on these

limitations in narrative form.  (*See id.* at 103.)

     C. Thomas W. Perron, N.P./Karamchand Rameshwar, M.D.

     Thomas W. Perron, N.P. ("Nurse Perron") completed two

"Treating Physician's Wellness Plan Report" forms, dated

February 19, 2015 and May 12, 2015, respectively, stating that

Plaintiff was unable to work for at least 12 months.  (*Id.* at

403-06.)  The February form noted diagnoses of mood disorder

rule out bipolar disorder, anxiety disorder, and polysubstance

dependence.  (*Id.* at 405.)  The May form noted diagnoses of

bipolar affective disorder and anxiety disorder not otherwise

specified.  (*Id.* at 403.)  Karamchand Rameshwar, M.D. ("Dr.

Rameshwar") co-signed both forms.  (*Id.* at 403-06.)

On March 16, 2015, Nurse Perron completed a "Mental Impairment Questionnaire," co-signed by Dr. Rameshwar.  (*Id.* at 424-29.)  According to the questionnaire, Nurse Perron began treating Plaintiff in March 2013, stopped for a brief period, and re-started treatment in May 2014, continuing through the date of the questionnaire.  (*Id.* at 424.)  Nurse Perron noted diagnoses of bipolar disorder and polysubstance dependence. (*Id.*)  Nurse Perron assigned Plaintiff a General Assessment of Functioning ("GAF")[2] score of 60.  (*Id.*)

Nurse Perron stated that Plaintiff's symptomatology was stable, and that Plaintiff was attending monthly appointments for medication management and making a "good effort."  (*Id.*)  Plaintiff was prescribed Seroquel and Wellbutrin.  (*Id.*)  Nurse Perron opined that Plaintiff's prognosis was "good."  (*Id.*)  Nurse Perron indicated that Plaintiff suffered from various symptoms, including: bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes;

---

[2] "The Fourth Edition of the Diagnostic and Statistical Manual of Mental Disorders Text Revision (DSM-IV-TR) had a multiaxial scale, which assessed an individual's condition on five axes, the fifth of which cited the individual's GAF, which was for reporting a clinician's judgment of an individual's overall level of functioning.  American Psychiatric Association, DSM-IV-TR 27, 32 (4th ed. text revision 2000).  A GAF score of 51-60 indicated moderate difficulty in social, occupational, or school functioning. *Id.* at 34.  The current edition of the DSM (DSM-5), released in May 2013, no longer uses the GAF scale.  *See* www.dsm5.org (last visited 1/31/18)."  (Stip. ¶ 7, n.4.)

appetite disturbance with weight change; decreased energy;
thoughts of suicide; feelings of guilt or worthlessness;
impairment in impulse control; mood disturbance; difficulty
thinking or concentrating; persistent disturbances of mood or
affect; substance dependence; and hyperactivity.  (*Id.* at 425.)

Nurse Perron opined, based on his examination, that
Plaintiff had a number of restrictions regarding his ability to
do work-related activities on a day-to-day basis in a regular
work setting.  (*Id.* at 426.)  Regarding Plaintiff's ability to
do "unskilled" work, Nurse Perron opined that Plaintiff could
perform satisfactorily in many areas, but was "seriously
limited" in "maintain[ing] regular attendance and be[ing]
punctual within customary, usually strict tolerances";
"work[ing] in coordination with or proximity to others without
being unduly distracted"; "mak[ing] simple work-related
decisions"; and "complet[ing] a normal workday and workweek
without interruptions from psychologically based symptoms."
(*Id.*)  Seriously limited was defined as meaning that "[the]
patient has noticeable difficulty (e.g., distracted from job
activity) from 11 to 20 percent of the workday or work week."
(*Id.*)[3]  Nurse Perron also opined that Plaintiff would be

---

[3] Nurse Perron also noted restrictions in Plaintiff's mental abilities and
aptitudes needed to do semiskilled and skilled work.  (*Id.* at 427.)  Nurse
Perron found Plaintiff would be "seriously limited" in "carry[ing] out
detailed instructions," "set[ting] realistic goals or mak[ing] plans

"seriously limited" in "maintain[ing] socially appropriate behavior." (*Id.*)

Nurse Perron opined that Plaintiff does not have a low IQ or reduced intellectual functioning. (*Id.*) Nurse Perron opined that Plaintiff had "moderate" functional limitations in "maintaining social functioning" and "maintaining concentration, persistence, or pace," and noted that Plaintiff had one or two "episodes of decompensation within 12 month period, each of at least two weeks duration." (*Id.* at 428.) Nurse Perron further opined that Plaintiff had "none-[to-]mild" restrictions in activities of daily life. (*Id.*)

Nurse Perron opined that Plaintiff had a mental disorder for at least two years that would result in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause him to decompensate. (*Id.*) Nurse Perron further opined that Plaintiff would be absent from work about two days a month, and that his impairment would last at least twelve months. (*Id.* at 429.)[4] Dr. Rameshwar endorsed Nurse Perron's assessment by including his stamp on the last page of the questionnaire. (*Id.*)

---

independently of others," or "deal[ing] with stress of semiskilled and skilled work." (*Id.*)

[4] As the parties noted in their stipulation, Nurse Perron said Plaintiff's impairments include alcohol and substance abuse, and that they contribute to his limitations, but did not explain their actual impact. (*Id.*)

## **Standard of Review**

Unsuccessful claimants for disability benefits may bring an action in federal court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C. §§ 405(g), 1383(c)(3) ("The final determination of the Commissioner of Social Security . . . shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.").  The reviewing court does not have the authority to conduct a *de novo* review, and may not substitute its own judgment for that of the ALJ, even when it might have justifiably reached a different result.  *See Cage v. Comm'r*, 692 F.3d 118, 122 (2d Cir. 2012).  Rather, "'[a] district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error.'"  *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).

"Substantial evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). If there is substantial evidence in the record to support the Commissioner's factual findings, those findings must be upheld.

15

42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]").  Inquiry into legal error requires the court to ask whether "'the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act.'"  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).  "The Act must be liberally applied, for it is a remedial statute intended to include not exclude."  *Id.* (quoting *Cruz*, 912 F.2d at 11).

## Discussion

### I.   The Commissioner's Five-Step Analysis of Disability Claims

The Supplemental Security Income program provides benefits to aged, blind, and disabled individuals who meet qualifying income, resource, and other criteria.  42 U.S.C. §§ 1381 *et seq.*  Benefits may not be paid unless the claimant meets the program's income and resource requirements.  *See id.* §§ 1382a, 1382b.  Furthermore, and as is relevant here, the claimant must establish that he qualifies as disabled within the meaning of Title XVI of the Act.  *See id.* §§ 1382c(a)(3)(A)-(B).

A claimant qualifies as disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant's impairment, or combination of impairments, is not considered disabling unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner's regulations establish a five-step sequential evaluation process for determining whether a claimant qualifies as disabled. *See* 20 C.F.R. § 416.920. The Commissioner's process is essentially as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits [his] capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the [RFC] to perform [his] past relevant work. Finally, if the claimant is unable to perform [his] past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step. *Burgess*, 537 F.3d at 128. "[B]ecause a hearing on disability benefits is a nonadversarial proceeding, [however,] the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (internal quotation marks omitted). "The Commissioner must consider the following in determining a claimant's entitlement to benefits: '(1) the objective medical facts [and clinical findings]; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability . . . ; and (4) the claimant's educational background, age, and work experience.'" *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 262 (E.D.N.Y. 2001) (quoting *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (alterations in original)).

## II.   The ALJ's Application of the Five-Step Analysis

Using the five-step sequential process to determine whether a claimant is disabled as mandated by 20 C.F.R. § 416.971, the ALJ made the following determinations:

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 19, 2013, the application date. (Tr. at 21.)

At step two, the ALJ found that Plaintiff suffers from the severe impairments of back impairment, status post-gunshot

wound, polysubstance abuse in remission, bipolar disorder, depressive disorder, and anxiety disorder. (*Id.*)

At step three, the ALJ determined that from August 19, 2013, through the date of the hearing, Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 21-23.) The ALJ, however, did consider whether Plaintiff's impairments meet Listing 1.04 (Disorders of the Spine) or Listing 12.04 (Depressive, Bipolar, and Related Disorders). (*Id.*) In assessing whether Plaintiff's impairments meet Listing 12.04, the ALJ found, *inter alia*, that Plaintiff had "moderate difficulties" with concentration, persistence, or pace. (*Id.*)

At step four, the ALJ determined that Plaintiff has the RFC to perform sedentary work, except that Plaintiff is limited to performing simple and routine tasks and can have only occasional contact with co-workers and the public. (*Id.* at 23-26.) Based on Plaintiff's RFC, the ALJ concluded that Plaintiff could not perform his past relevant work as a fast food worker. (*Id.* at 26.)

At step five, the ALJ found that – considering Plaintiff's age, education, work experience, and RFC – Plaintiff could perform jobs which exist in significant numbers in the

national economy.  (*Id.* at 26-27.)  As such, the ALJ found
Plaintiff not disabled.  (*Id.*)

III.   **The ALJ's Error in Applying the Five-Step Analysis**

          Plaintiff argues the ALJ erred in considering his
application for Supplemental Security Income benefits.  The
court agrees and finds that the ALJ: (1) did not properly
consider the medical evidence; (2) did not sufficiently develop
the record; and (3) did not account for Plaintiff's moderate
non-exertional limitations in assessing Plaintiff's RFC.

     a. <u>The ALJ Did Not Properly Consider the Medical Evidence</u>

          As noted above, the ALJ found that Plaintiff had the
RFC to perform sedentary work, except that Plaintiff was limited
to performing simple and routine tasks and could have only
occasional contact with coworkers and the public.  (*Id.* at 23.)

          In addressing Dr. McCormick's opinion, the ALJ noted
that Plaintiff presented to Dr. McCormick complaining of
symptoms including, in relevant part, short-term memory deficits
and concentration difficulties.  The ALJ found that, despite
these symptoms, Plaintiff reported he lived alone, "is
essentially independent with activities of daily living, can
take public transportation, and has friends."  (*Id.* at 24.)  The
ALJ cited Dr. McCormick's finding that Plaintiff has "only
mildly impaired attention and concentration, and only mildly
impaired recent and remote memory skills."  (*Id.*)

The ALJ noted Dr. McCormick's opinion that Plaintiff has mild limitations in his ability to relate adequately with others and deal with stress. (*Id.*)  The ALJ also cited Dr. McCormick's conclusion that Plaintiff can follow and understand simple directions and instructions and perform simple tasks independently. (*Id.*)  The ALJ stated this part of Dr. McCormick's opinion was given "great weight as it is supported by her mental status examination findings, the claimant's general independence with activities of daily living, his ability to live alone, his ability to socialize, and [Nurse] Perron's mostly normal treatment notes." (*Id.* at 24-25.)

The ALJ, however, had a different approach with respect to the remainder of Dr. McCormick's report.  The ALJ cited Dr. McCormick's opinion that Plaintiff has moderate limitations in maintaining attention and concentration, performing complex tasks independently, and making appropriate decisions. (*Id.* at 24.)  The ALJ stated "[t]his portion of [Dr. McCormick's] opinion cannot be given great weight as it appears based on [Plaintiff's] subjective allegations rather than objective findings." (*Id.*)  The ALJ also noted that "the claimant's general independence with activities of daily living, his ability to live alone, his ability to socialize, and [Nurse] Perron's mostly normal treatment notes all suggest greater functional abilities than those noted by Dr. McCormick." (*Id.*)

After addressing Dr. McCormick's opinion, the ALJ addressed Dr. Kennedy-Walsh's finding that Plaintiff has moderate limitations, *inter alia*, in maintaining attention and concentration for extended periods, and in sustaining an ordinary routine.  (*Id.* at 25.)  The ALJ gave Dr. Kennedy-Walsh's opinion "little weight."  (*Id.* at 25.)  The ALJ also addressed Nurse Perron's finding that Plaintiff has serious limitations, *inter alia*, in maintaining concentration and sustaining regular attendance.  (*Id.*)  The ALJ gave "little weight" to Nurse Perron's opinion.  (*Id.* at 25-26.)

The court notes that there were three separate medical source opinions in the file: those of the treating sources, Dr. Rameshwar and Nurse Perron; those of the consultative examiner, Dr. McCormick; and those of the State medical expert, Dr. Kennedy-Walsh.  All three found that Plaintiff would have moderate difficulty in maintaining attention and concentration, and would either have moderate difficulty in maintaining a schedule or would "need help" to do so.  (*Id.* at 105, 333, 426-28.)  Yet, the ALJ assigned little weight to the portions of Dr. McCormick's opinion which were consistent with the other opinions and were uncontroverted by any qualified medical source.

There is also no indication that the ALJ adequately considered Dr. McCormick's finding that, "with help," Plaintiff

could maintain a schedule and learn complex tasks.  That finding
is not addressed by the ALJ in any manner, despite the fact that
the other two experts testified that Plaintiff would struggle to
maintain a schedule, and that the vocational expert testified
that an inability to adhere to a schedule would preclude work.
(*Id.* at 25-26; 91-94.)  (This issue is addressed again below.)

Moreover, the court is concerned with the ALJ's
decision to credit only certain portions of Dr. McCormick's
report.  "Reviewing courts decry administrative 'cherry picking'
of relevant evidence." *Younes v. Colvin*, No. 1:14-CV-170
DNH/ESH, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015).  "This
term refers to crediting evidence that supports administrative
findings while ignoring conflicting evidence from the same
source." *Id.* (citing *Smith v. Bowen,* 687 F. Supp. 902, 904
(S.D.N.Y. 1988)).  "'Cherry picking' can indicate a serious
misreading of evidence, failure to comply with the requirement
that all evidence be taken into account, or both." *Genier v.
Astrue*, 606 F.3d 46, 50 (2d Cir. 2010).  Although "[t]here is no
absolute bar to crediting only portions of medical source
opinions," "when doing so smacks of 'cherry picking' of evidence
supporting a finding while rejecting contrary evidence from the
same source, an [ALJ] must have a sound reason for weighting
portions of the same-source opinions differently."  *Id.*

23

Here, the court finds that the ALJ's purported explanation for his apparent cherry picking is insufficient to explain his decision to discredit portions of Dr. McCormick's report.  The ALJ notes only that the discredited portions of the opinion "appear" to be based on Plaintiff's subjective statements, but does not explain the basis for this conclusion. (*See* Tr. at 24.)  Consequently, the court's review is made difficult, particularly as Dr. McCormick's report appears to contain at least some "objective" bases for the findings, for instance, noting with respect to attention and concentration that Plaintiff "was able to do counting and simple calculations," but "was not able to count backward by 3s from 20."  (*Id.* at 332.)  And, as noted above, it is troubling that the discredited portion of Dr. McCormick's opinion is consistent with the opinions of two other medical sources.

Furthermore, the ALJ's explanation as to Plaintiff's purported general independence with activities of daily living, ability to live alone, and ability to socialize is lacking. Although the ALJ routinely cites to the claimant's general independence as a basis for rejecting certain findings, the evidence he primarily cites is Dr. McCormick's opinion (*see id.* at 23), which appears to indicate that Plaintiff receives assistance in his activities of daily living (*see id.* at 333). Plaintiff's testimony, which is closer in time to the ALJ's

decision than Dr. McCormick's assessment, and the function report filled out, in part, by Plaintiff's former landlord contradict the ALJ's finding.  Both reflect that Plaintiff has few, if any, friends and does not socialize; has limited ability to maintain hygiene; and relies upon his former landlord or his mother for assistance with basic activities of daily life.  The record also reflects that Plaintiff has regularly been involved in altercations with both strangers and family members.

> b. <u>The ALJ Did Not Develop the Record as to Whether Plaintiff Could Maintain a Schedule</u>

Plaintiff also argues that the ALJ erred by failing to develop the record as to Dr. McCormick's opinion that Plaintiff could maintain a schedule "with help," without clarifying the extent to which Plaintiff could actually maintain a schedule, or what sort of help would be required.  The court agrees.

"It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'"  *Pratts v. Chater,* 94 F.3d 34, 38 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)).  This duty "exists even when, as here, the claimant is represented by counsel."  *Id.*  If the claimant's medical record is inadequate, it is thus "the ALJ's duty to seek additional information from the [treating physician] *sua*

*sponte.*"  *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999) (explaining that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record").

In this instance, the ALJ did not seek clarification from Dr. McCormick regarding her finding that Plaintiff could maintain a schedule "with help."  Both other medical sources described by the ALJ noted that Plaintiff would struggle to maintain a schedule.  Dr. Kennedy-Walsh opined Plaintiff would have "moderate limitations" in maintaining a schedule.  (Tr. at 105.)  And Nurse Perron and Dr. Rameshwar opined that Plaintiff would be "seriously limited" in maintaining regular attendance and being punctual within customary tolerances, and, more explicitly, found that Plaintiff would be expected to be absent from work for 2 days per month.  (*Id.* at 426, 429.)

Consideration of maintaining a schedule, including attendance, was not adequately explained by the ALJ, as the vocational expert testified that anything "[m]ore than one day a month [of missed work due to medical reasons]" would be considered excessive at the unskilled level.  (*Id.* at 97.)  Yet, despite the lack of clarification from Dr. McCormick, and the testimony of the other medical sources, the ALJ did not address Plaintiff's potential absences from work in his decision.  In

light of this record, the court agrees with Plaintiff that the
ALJ should have sought clarification from Dr. McCormick as to
the extent to which she believed Plaintiff could maintain a
schedule, and what sort of "help" would be required to do so.

   c. The ALJ Did Not Account for Plaintiff's Moderate Non-
      Exertional Limitations in His RFC

   Plaintiff also argues the ALJ erred by making an RFC
determination and posing related hypotheticals to the vocational
expert which failed to expressly account for the moderate non-
exertional limitations set forth by Plaintiff's medical sources,
namely, that Plaintiff had moderate limitations in maintaining
attention and concentration and in maintaining a regular
schedule.  (*See* Pl. Mem., at 8-9.)

   Plaintiff argues that, under the Second Circuit's
holding in *McIntyre v. Colvin*, 758 F.3d 146 (2d Cir. 2014), an
ALJ may not assume that a restriction to "simple" or "unskilled"
work is equivalent to, or *per se* incorporates, a limitation
relating specifically to "concentration, persistence, or pace."
(*See* Pl. Mem., at 8-9 (arguing that *McIntyre* requires for the
concentration, persistence, or pace limitation to be otherwise
accounted for in the RFC).)

   In *McIntyre v. Colvin*, 758 F.3d 146 (2d Cir. 2014), a
claimant argued the ALJ erred by failing to explicitly include
her non-exertional (*i.e.*, non-physical) limitations in his RFC

finding, posed a hypothetical question to the vocational expert that was incomplete in that way, and then improperly relied on the vocational expert's testimony to conclude there were jobs in the national economy that the claimant could perform. *Id.* at 151. The Second Circuit noted that, at step five, the ALJ must determine whether a claimant can perform jobs which exist in the national economy either by (a) applying the Medical Vocational Guidelines or (b) adducing testimony of a vocational expert. *Id.* "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *Id.* (internal quotation marks and citations omitted).

The *McIntyre* panel noted that "[t]he hypothetical presented to the vocational expert . . . closely tracked the ALJ's [RFC] assessment," which "failed to mention explicitly McIntyre's non-exertional limitations." *Id.* The hypothetical, however, added a limitation to "simple, routine, low stress tasks." *Id.* Although the Second Circuit "ha[d] not specifically decided whether an ALJ's hypothetical question to a vocational expert must account for limitations in concentration, persistence, and pace," its "case law is plain that 'the combined effect of a claimant's impairments must be considered

in determining disability.'" *Id.* (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995)). Consequently, "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace." *Id.*

The *McIntyre* court found the ALJ's error to be harmless. "[A]n ALJ's failure to incorporate non-exertional limitations in a hypothetical (that is otherwise supported by evidence in the record) is harmless error if (1) 'medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace," and the challenged hypothetical is limited "to include only unskilled work"; or (2) the hypothetical 'otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]'" *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The panel found that substantial evidence demonstrated the claimant could engage in "simple, routine, low stress tasks," notwithstanding her limitations in concentration, persistence and pace, and by limiting the hypothetical to such tasks, the ALJ accounted for the combined effect of the claimant's impairments. *Id.* The ALJ's error was, therefore, found to be harmless. *Id.*

Here, as in *McIntyre*, the ALJ found that Plaintiff had "moderate difficulties" in the domain of "concentration,

persistence, and pace," but failed to include any such
limitations (at least explicitly) in the RFC determination.
(*See id.* at 22-26.)   Moreover, as the Commissioner appears to
concede (*see* ECF No. 20, Commissioner's Reply ("Plaintiff argues
that the ALJ needed to specify that Plaintiff had moderate
limitations in social functioning as well as in concentration,
persistence and pace in the hypothetical the ALJ posed to the
vocational expert at the hearing.  The Second Circuit, however,
has no such requirement.")), the ALJ failed to account for these
limitations in the hypothetical he posed to the vocational
expert (*see* Tr. at 90-99).

        Defendant argues that, by restricting Plaintiff to
only simple work and occasional interaction with others, the
ALJ's RFC "otherwise implicitly accounted for limitations
involving concentration, persistence, and pace."  (*See* Def.
Reply Mem., at 4.)  The court acknowledges the Commissioner's
argument that the ALJ found Plaintiff could engage in simple,
routine tasks and have only occasional contact with coworkers
and the public.  (*See* Tr. at 23.)

        All medical source opinions, however, indicate that
Plaintiff had moderate limitations in maintaining concentration
and attention and performing activities within a regular
schedule.  (*Id.* at 105-106, 330-334, 424-429.)  It is true that
Dr. McCormick opined that Plaintiff had no limitations in his

ability to follow and understand simple directions or to perform simple tasks.  (*Id.* at 333.)  But her opinions do not clarify whether Plaintiff could engage in such tasks on a sustained basis, over the course of a workday, despite Plaintiff's limitations in maintaining concentration and attention, and the fact that Plaintiff would need "help" adhering to a regular schedule.  (*See id.*)

Moreover, although the ALJ posed a hypothetical to the vocational expert in which the hypothetical person would be "off task 15% of the workday" (*see id.* at 92), the ALJ failed to address that testimony in his decision.  This omission appears to require further explanation, as the vocational expert testified that said the hypothetical individual would not be able to sustain employment if he was off task more than 10%. Because the ALJ specifically found Plaintiff would have moderate limitations in concentration persistence and pace, he should have made some provision in his RFC for time off task. Moreover, the ALJ should have considered further whether Plaintiff was limited in his ability to maintain a schedule.

Without the ALJ's rationale on these important issues, the court cannot conduct a meaningful review of the ALJ's decision and cannot conclude that his errors were harmless. *See, e.g.*, *Matthews v. Comm. of Soc. Sec.*, No. 1:17-cv-00371-MAT, 2018 WL 4356495, at *4 (W.D.N.Y. Sept. 13, 2018) (remanding

where ALJ failed to provide an adequate explanation of his assessment of a medical opinion, thereby "depriving the Court of the ability to perform a meaningful review").

## Conclusion

Federal regulations explicitly authorize a court, when reviewing decisions of the Social Security Administration, to order further proceedings when appropriate.  42 U.S.C. §§ 405(g), 1383(c)(3) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").  Remand is warranted where "'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'"  *Rosa*, 168 F.3d at 82-83 (quoting *Pratts*, 94 F.3d at 39) (internal quotation marks omitted).  Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision.  *Pratts*, 94 F.3d at 39.  The Court has determined that the ALJ did not apply the law appropriately in this case and that further explanation is necessary to clarify the ALJ's rationale,

as set forth above.  Accordingly, this action is remanded for further proceedings consistent with this Memorandum and Order.

**SO ORDERED.**

Dated:     Brooklyn, New York
           April 22, 2020

                                         _____/s/_____
                                         Hon. Kiyo A. Matsumoto
                                         United States District Judge